IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| GRUMPY'S BAIL BONDS, LLC ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | NO. 3:20-cv-00923 |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| RUTHERFORD COUNTY, TENNESSEE ET AL., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

Pending before the Court is a Motion to Dismiss brought by Defendants Rutherford County, Tennessee ("County"), Judge Ben Bennett, Judge Lisa A. Eischeid, Judge Toby Gilley, and Judge Ben Hall McFarlin, Jr. ("County Judges") (together, "County Defendants") (Doc. No. 44, "County Motion"), filed with a supporting memorandum (Doc. No. 45, "County Memorandum"). Also pending before the Court is a Motion to Dismiss brought by Defendants Judge Atwood, Judge Rogers, Judge Scarlett, Judge Tidwell, Judge Turner and Chancellor Wilson, who are the State Court Judges of the 16th Judicial District ("State Defendants") (Doc. No. 47, "State Motion"), filed with a supporting memorandum (Doc. No. 48, "State Memorandum"). Plaintiffs responded to each motion, making a pair of filings with respect to the County Motion (Doc. Nos. 55, 56) and a pair of filings with respect to the State Motion (Doc Nos. 57, 58). The County Defendants and the State Defendants each replied separately in support of their own motion. (Doc. Nos. 63 and 64, respectively).

In this case, six bail bonding companies that operate in the 16th Judicial District of Tennessee challenge restrictions allegedly curbing the operation of their businesses as bail

bondsmen in violation of their constitutional rights. (Doc. No. 30 at 3). In particular, Plaintiffs

challenge certain provisions of the Local Rules for Bondsmen ("Local Rules")[1], enacted in

November 2015 by the Judges of the 16th Judicial District ("State Defendants") "along with agents

and employees of Rutherford County." (*Id*. at 3–4). Plaintiffs also challenge the constitutional

validity of a Pretrial Release Program established by Rutherford County in May 2019. (*Id*. at 7).

## FACTUAL ALLEGATIONS[2]

<u>The Local Rules</u>

Plaintiffs contend that the Local Rules requiring drug screening of prospective bondsmen

and allowing random drug screening of instated[3] bond agents violate the Fourth Amendment's

---

[1] The Local Rules were not attached to the Amended Complaint (Doc. No. 30). They were, however, attached to the State Motion. (Doc. No. 47-1). The face of the Amended Complaint includes any provisions of the Local Rules that Plaintiffs allege are unconstitutional, and Defendants do not appear to challenge Plaintiffs' recitation of any relevant portions of the Local Rules. Because the Local Rules are expressly and extensively referenced in the Amended Complaint and are integral to Plaintiff's claims, the Court will consider the Local Rules (as attached at Doc. No. 47-1) in their entirety for purposes of the pending Motion. *See, e.g.*, *Comm. Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 U.S. 327, 335 (6th Cir. 2007) (holding that a district court may consider documents referenced in the pleadings that are integral to the claims in deciding motion to dismiss).

[2] The alleged facts in this section are taken from the Amended Complaint (Doc. No. 30, "Complaint") and where stated without qualification, accepted as true for purposes of the Motion.
 But to the extent that allegations referred to below are legal conclusions or other mere conclusory allegations, they are not accepted as true but rather are identified (by qualifying language such as "Plaintiff contends that") as merely something Plaintiff claims, as opposed to something the Court is accepting as true for purposes of the Motion. This is because, as described in the Legal Standard section below, certain allegations in a complaint are *not* entitled to an assumption of truth—and Plaintiffs include many such allegations in the Complaint. Under the standards set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*") and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*"), "bare assertions" and "bald" allegations need not be accepted as true the way (alleged) *factual matter* must be. Much of the Complaint alleges "facts" that are, in actuality, conclusory allegations that cannot be accepted by the Court as true for purposes of ruling on the Motions.

[3] Though Plaintiffs do not define the term "instated bond agents" the Court takes this term to mean any agents approved by the 16th Judicial District to write bonds as outlined in Rule 2 of the Local Rules. (Doc. No. 47-1 at 1–3).

guarantee against unreasonable and unconstitutional searches. (*Id*. at 4–5). Local Rule 2 requires any prospective bondsmen to submit an "Oral Fluid Testing drug screen" performed within 48 hours of the date of filing the petition for permission to write bonds. (Doc. No. 47-1. at 1). Local Rule 6(4) states:

> All qualified agents may be subject to random drug screens as requested by the Court. A request for a screen may be initiated by the District Attorney or his designee by written request to the Administrative Judge. The request shall specify the type of test requested and the basis for the request. The test shall be ordered by the Judge for good cause shown.

(*Id*. at 6).

The Local Rules also "limit[] the authority of authorized and solvent professional bondsmen to write bail by imposing, in Local Rule 3(5), a 'cap' on any single bond of 20% of available capacity." (Doc. No. 30 at 12). Local Rules 6(5) and 7(6) include the following, which the Court understands Plaintiffs refer to as a "summary suspension" policy:

> All agents or employees of a bonding company shall conduct themselves in accordance with all the rules and orders of the Sheriff and Circuit Courts of the 16th Judicial District while performing required duties within such buildings. The penalty for a first violation of this provision is a suspension for not less than ninety (90) days. The penalty for a second violation of this provision is a suspension for not less than six (6) months. After any suspension, the bonding company must petition the Court for reinstatement of the bonding company and/or agent. The penalty for a third or subsequent violation of this provision is termination of the privilege to write bonds in the 16th Judicial District.

> [. . .]

> Bonding companies shall be prohibited from making or initiating credit bonds on cases where the total bonds for any defendant exceed Twenty Thousand ($20,000.00). No additional funds, installment arrangements or unfinished payments in satisfaction of the premium may be received, collected or demanded following release of the defendant/principal from custody for any bonds for any single defendant in excess of Twenty Thousand ($20,000,00), except as authorized by T.C.A. § 40-11-318 or other applicable law. Any violation of this rule will result in the immediate suspension of the bonding company and agent from writing bonds for a period of not less than three (3) months for a first offense. A second offense shall result in the immediate suspension of the bonding company and agent from

writing bonds for a period of not less than six (6) months. The bonding company may petition the Court for a hearing to reconsider the suspension

(*Id*. at 6).

The Pretrial Release Program

Plaintiffs argue that the Pretrial Release Program permits the release of pre-trial detainees "without having secured their release as required by Tennessee Law" and allows for the release of criminal defendants "based upon criteria other than those set forth in Tenn. Code Ann. §§ 40-11-115 through 122." (*Id*. at 7). The Judges of the 16th Judicial District approved the Pretrial Release Program. (*Id*. at 8).

Plaintiffs contend that "[a] large portion of [the 219 criminal defendants released pursuant to the Pretrial Release Program] either intended to or would have secured release through the use of the Plaintiffs' services." (*Id*.). Without identifying any particular criminal defendants, or articulating a precise number of criminal defendants to which this allegation applies, Plaintiffs assert that they "were asked by the criminal defendant, or by someone on behalf of the criminal defendant, to secure the release of the criminal defendant" and reached an agreement to that effect, but then after the defendant arrived at jail, the Plaintiffs were told that their services were no longer needed because they were released under the Pretrial Release Program and no longer needed to post bail. (*Id*. at 8–9).[4]

_____

[4] The Court declines to accept this contention as true because it finds that this falls under the category of a "bare assertion" or "bald allegation" not entitled to the assumption of truth under *Iqbal* and *Twombly*. Plaintiffs neither specify which Plaintiff they refer to here, or alternatively, clarify that they are alleging that these alleged "agreements" were entered into by all Plaintiffs together (as Plaintiffs' use of the plural here would suggest, implausibly). Nor are Plaintiffs clear about who they are referring to as "the criminal defendant" and whether this "criminal defendant" in fact had monetary bail set in their criminal case. The Court addresses in more detail below these issues it takes with this allegation, but in any event, it does not accept it as true for purposes of ruling on the Motions.

Plaintiffs state that "[n]either the Courts of the 16th Judicial District nor Rutherford County have the authority to dictate to the judicial magistrates the exercise of the magistrates' discretion in setting the conditions of release for a criminal defendant, nor to authorize the release of criminal defendants except as provided by the laws of the State of Tennessee" and that "there is an unstated goal of the pre-trial release program to eliminate the use and availability of the private, professional bondsman in the 16th Judicial District." (*Id*. at 8).

Claims

Plaintiffs bring three claims.[5] Count I asserts that the drug-testing policies in the Local Rules "are an unreasonable search of the Plaintiffs and their agents" in violation of the Fourth Amendment, and seeks "a declaratory judgment that the Defendants' policy of suspicionless drug testing violates the rights guaranteed to the Plaintiffs and their agents under the Fourth Amendment." (*Id*. at 11–12).

Count II asserts that the Local Rules "prohibit Plaintiffs from conducting lawful business specifically authorized under Tennessee law" and limit the authority of bondsmen to write bail by imposing "a 'cap' on any single bond of 20% of available capacity" via Local Rule 3(5). Plaintiffs argue that the Local Rules set forth "unlawful and unconstitutional restrictions on the Plaintiffs' business activities," pose "the threat of summary punishment," and have resulted in the deprivation of property and due process rights under the Fourteenth Amendment. (*Id*. at 12–13).

Also included under Count II is a notably separate claim—that the "summary suspension authorized by the Local rules . . . have also impermissibly shifted the burden of proof away from the State to show why the Plaintiffs should be suspended to the Plaintiffs to show why they should

---

[5] Plaintiffs make a variety of allegations in the background section of the Complaint that do not seem actually implicated by any of the three claims.

be reinstated" thus resulting in an alleged "deprivation of rights" and "real harm" to Plaintiffs. (*Id.* at 13). Plaintiffs seek via Count II "a declaratory judgment that the Defendants' summary suspension policy violates the due process rights guaranteed to the Plaintiffs and their agents under the Fourteenth Amendment" and "a declaratory judgment that the Defendants' enforcement of the Local Rules has violated the equal protection rights of the equal protection rights guaranteed to the Plaintiffs and their agents under the Fourteenth Amendment." (*Id.*).

Finally, Count III seeks a preliminary injunction against the enforcement of the Local Rules "and the modification of those rules" pending the resolution of this case. (*Id.* at 14).

## LEGAL STANDARD

Defendants seek dismissal pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Federal courts must decide jurisdictional questions before considering issues related to the merits of a case. *See In re: 2016 Primary Election*, 836 F.3d 584, 587 (6th Cir. 2016). Therefore, the Court will first consider the Defendants' 12(b)(1) motions.

Rule 12(b)(1) "provides for the dismissal of an action for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). "Subject matter jurisdiction is always a threshold determination." *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007). And the party invoking federal jurisdiction has the burden to prove that jurisdiction. *Global Technology, Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015); *Golden v. Gorno Bros.*, 410 F.3d 879, 881 (6th Cir. 2005).

There are two types of motions to dismiss for lack of subject-matter jurisdiction: facial and factual attacks. *Gentek Bldg. Products, Inc. v. Sherman-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A facial attack questions merely the sufficiency of the pleading. When reviewing a facial attack, a district court takes the allegations in the complaint as true. *Id.* If those allegations establish

federally-cognizable claims, jurisdiction exists. *Id.* A factual attack instead raises a factual controversy concerning whether subject-matter jurisdiction exists. *Id.*

Where there is a factual attack on the subject-matter jurisdiction of the court under Fed. R. Civ. P. 12(b)(1), no presumptive truthfulness applies to the complaint's allegations; instead, the court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter jurisdiction does or does not exist. *Gentek Bldg. Products, Inc.*, 491 F.3d at 330. "[T]he district court has considerable discretion in devising procedures for resolving questions going to subject matter jurisdiction[.]" *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 327 (6th Cir. 1990).

Defendants' attacks of Plaintiffs' Article III standing constitute a challenge to subject-matter jurisdiction, because Article III "[s]tanding is a jurisdictional requirement," and "[i]f no plaintiff has standing, then the court lacks subject-matter jurisdiction." *Tennessee General Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019). Like any challenge to subject-matter jurisdiction generally, a challenge specifically to the plaintiff's standing can be in the form of either a facial attack or a factual attack. *Kale v. Procollect, Inc.*, No. 2:20-CV-2776-SHM-TMP, 2021 WL 2784556, at *2 (W.D. Tenn. July 2, 2021) ("Challenges to standing can be facial or factual."); *In re Saffold*, 373 B.R. 39, 43 (Bankr. N.D. Ohio 2007) ("A challenge to standing may be either a facial attack on a pleading or a factual attack.").

"A facial attack on standing challenges the legal sufficiency of the complaint, whereas a factual challenge against standing questions whether the complaint's factual assertions reflect reality." *Shumway v. Neil Hosp., Inc.*, No. 121CV01059STAJAY, 2021 WL 5181754, at *1 (W.D. Tenn. Nov. 8, 2021) (citing *Ohio Nat. Life Ins. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). A review of the Motions reveal that both the State and County Defendants make a facial rather than a factual challenge to Plaintiffs' standing.

Therefore, the Court will consider only the sufficiency of the Complaint and will (subject to the exceptions that were anticipated in a footnote above and will be made apparent, consistent with that footnote, in the text below) "accept the allegations set forth in th[at] complaint as true." *Gaylor*, 582 F. App'x. at 579.

Article III Standing

To satisfy Article III's standing requirements, a plaintiff must show: (1) he or she has suffered an "injury-in-fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Doe v. Byrd*, No. 1:18-cv-00084, 2020 WL 1285428, at *2 (M.D. Tenn. Mar. 18, 2020). The Supreme Court has emphasized that an injury-in-fact must be "concrete and particularized"—an element that encompasses two distinct requirements. *Spokeo, Inc.v. Robins*, 578 U.S. 330, 340 (2016) ("We have made it clear time and time again that an injury in fact must be both concrete and particularized."). To be "concrete," an injury must be "de facto"—meaning that it actually exists—and to be "particularized," the injury "must affect the plaintiff in a personal and individual way." *Id*.

At the pleading stage, the plaintiff must clearly allege facts demonstrating each element of standing. *Id*. at 338, 136 S. Ct. 1540 (citing *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

## DISCUSSION

A.  Standing

As "standing is not dispensed in gross," the Supreme Court has held that standing is "claim-specific"; that is, a plaintiff must have standing for each claim he pursues. *Lewis v. Casey*, 518 U.S. 343, 358 (1996); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006) ("[A] plaintiff

must demonstrate standing for each claim he seeks to press."). *See also Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 253 (6th Cir. 2018); *Hagy v. Demers & Adams*, 882 F.3d 616, 620 (6th Cir. 2018); *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015) ("A plaintiff must have standing for each claim pursued in federal court."); *Fednav, Ltd. v. Chester*, 547 F.3d 607, 614 (6th Cir. 2008) ("[T]hat a plaintiff has standing to challenge one of a statute's provisions does not mean the plaintiff has standing to challenge all of them."). Therefore, the Court will separately address Plaintiffs' standing to bring each claim.

### a. Count I

Count I alleges a Fourth Amendment violation based on the drug-testing policy contained in the Local Rules. (Doc. No. 30 at 11–12). Plaintiffs argue that this policy of "suspicionless drug testing" constitutes an "unreasonable search of Plaintiffs and their agents" and seek both damages and declaratory relief. (*Id*.). Where, as here, a plaintiff seeks prospective declaratory relief, a plaintiff must allege facts plausibly suggesting that he is "immediately in danger of sustaining some direct injury as a result of the challenged official conduct," and that he faces a threat of injury that is "real and immediate, not conjectural or hypothetical." *Lyons*, 461 U.S. 95 at 101-02 (1983) (finding that plaintiff lacked Article III standing to enjoin city from using chokeholds allegedly permitted under the petitioner city's policy, where plaintiff could not show any real and immediate threat of enduring a chokehold despite having been subject to chokehold in the past); see also *Lujan*, 504 U.S. at 564,.

Plaintiffs have not alleged an "actual or imminent" injury related to the drug-testing policy in the Local Rules. In the Complaint, Plaintiffs state only: "The Defendants have implemented drug testing in accordance with these Local Rules, subjecting the Plaintiffs to unreasonable and unconstitutional searches in violation of their rights under the Fourth Amendment to the

Constitution of the United States." (Doc. No. 30 at 5). The Court cannot find from this vague statement alone either of the assertions that would be sufficient to allege an injury-in-fact sufficient to plead Article III standing, *i.e.*, that either (a) Plaintiffs have in fact already been drug tested pursuant to the Local Rules; or (b) Plaintiffs face an imminent risk of being drug tested pursuant to the Local Rules. *Glennborough Homeowners Ass'n v. United States Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021) (a plaintiff "cannot rely on general or conclusory allegations in support of its standing, but instead must assert a plausible claim for why it has standing") (citing *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 544 (6th Cir. 2021)); *Arkansas Right to Life State Pol. Action Comm. v. Butler*, 146 F.3d 558, 560 (8th Cir. 1998) ("Vague and conclusory allegations of harm are insufficient to create standing.").

Put differently, the only statement in the Complaint that bears on the "injury-in-fact" element could be read either as an allegation that Plaintiffs have *actually* been drug tested (in which case Plaintiffs failed to allege facts clearly demonstrating that this drug testing took place), *or*, that Plaintiffs are only "subject to" the drug testing rule but have not actually been drug tested (in which case, Plaintiffs failed to allege facts clearly demonstrating that such drug testing was "imminent"). *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (holding that "threatened injury must be certainly impending to constitute injury in fact" and "allegations of possible future injury are not sufficient" for injury to be "imminent") (internal citations and quotation marks omitted).[6]

---

[6] The Court notes that, as explained by the Sixth Circuit: "'[I]n a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm.' *TransUnion*, 141 S. Ct. at 2210–11. Rather, plaintiffs must demonstrate that the 'the risk of future harm materialized,' or that the plaintiffs 'were independently harmed by their exposure to the risk itself.' *Id.* at 2211." *Ward v. Nat'l Patient Acct. Servs. Sols., Inc.*, 9 F.4th 357, 361 (6th Cir. 2021). Here, Plaintiffs bring claims for damages, declaratory relief, and injunctive relief. Thus, because Plaintiffs seek not only damages but also forward-looking injunctive relief, it is appropriate for Plaintiffs to assert a risk-of-harm theory of standing.

"A plaintiff cannot manufacture standing based on an overreaction to speculative fears of potential enforcement." *Yatooma v. Birch Run Twp.*, No. 1:22-CV-10870, 2022 WL 1913601, at *2 (E.D. Mich. June 3, 2022) (citing *Clapper*, 568 U.S. at 414). Rather, the threat of enforcement of the law at issue must be *imminent*—meaning that the claimed threatened injury must be "certainly impending." *See Clapper*, 568 U.S. at 409. Plaintiffs do not allege any facts suggesting that drug testing of any Plaintiff pursuant to enforcement of the Local Rules is "certainly impending." *Clapper*, 568 U.S. at 409. "[A]llegations of possible future injury are not sufficient." *Id*. (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (internal quotation marks omitted).

Courts have found a lack of Article III standing where a plaintiff alleges no facts suggesting that the law being challenged was likely to be enforced against the plaintiff. For example, in *Stavrianoudakis v. U.S. Dep't of Fish & Wildlife*, 435 F. Supp. 3d 1063 (E.D. Cal. 2020), the plaintiffs, a group of licensed falconers, brought a Fourth Amendment claim challenging a regulation giving government agents the authority to conduct warrantless searches of falconry facilities. *Id*. at 1074. Plaintiffs' alleged injury was based on the "fear of *future* searches." *Id*. at 1078. The Court declined to find Article III standing because no plaintiff was ever subjected to the unannounced inspections pursuant to the challenged regulation and no facts established that such risk was "certainly impending," forcing the Court to "speculate as to whether unannounced inspections will be conducted on Plaintiffs in the future." *Id*. at 1079.

This Court has been put in the same position. Without Plaintiffs alleging facts giving the Court any reason to believe that Plaintiffs will be imminently subjected to the drug testing set forth in the Local Rules, the Court can only speculate as to whether such drug testing is likely to occur and indeed "certainly impending." Like the plaintiffs' fears in *Stavrianoudakis*, Plaintiffs' fears of future drug testing are not enough to confer standing. *See also Oregon Prescription Drug*

*Monitoring Program v. U.S. Drug Enf't Admin.*, 860 F.3d 1228, 1234 (9th Cir. 2017) (intervenors lacked standing to bring Fourth Amendment challenge to the DEA's use of administrative subpoenas where they "provided no evidence that the DEA is seeking or will seek any records related to them"); *Parker v. Wolf*, 506 F. Supp. 3d 271, 281 (M.D. Pa. 2020), *aff'd sub nom. Parker v. Governor of Pennsylvania*, No. 20-3518, 2021 WL 5492803 (3d Cir. Nov. 23, 2021) (dismissing for lack of standing where plaintiffs "fear[ed] being subjected to a future quarantine directive" and "fear[ed] being subjected to 'government surveillance'" but alleged no facts showing that the enforcement of challenged Contact Tracing Program law against plaintiffs was likely); *Hughes v. City of Cedar Rapids, Iowa*, 840 F.3d 987, 992 (8th Cir. 2016) (plaintiff lacked standing to bring claim based on his "fear that, as a Vehicle Owner regularly using the roads in Cedar Rapids, [he] may be subject to . . . civil liability resulting from the operation of the City's fixed or mobile ATE system's cameras.").   Thus, even when drawing inferences in Plaintiffs' favor, this sole sentence in the Complaint, without any supporting factual matter, is not enough for Plaintiffs to meet their burden of clearly alleging facts demonstrating each element of standing. *Warth*, 422 U.S. at 518. Accordingly, the Court finds that Plaintiffs have not alleged sufficient facts demonstrating standing to bring Count I, and the motions to dismiss Count I will be granted.[7]

---

[7] Even if Plaintiffs had adequately alleged that they were in fact, or imminently would be, drug tested pursuant to the Local Rules, the Court is not convinced that drug testing consistent with the Local Rules would constitute a constitutional violation. That is because the Supreme Court has explicitly held that certain types of suspicionless drug testing, when administrated by the government in furtherance of certain public safety interests, for example, is not violative of the Fourth Amendment. *See Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 633–34 (1989) (upholding regulation governing warrantless and suspicionless drug and alcohol testing of railroad employees based on public safety interests, finding no Fourth Amendment violation and noting that the government's interest in regulating certain industries "presents special needs beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements"). *See also Penny v. Kennedy*, 915 F.2d 1065 (6th Cir. 1990) (finding that mandatory drug testing of fire fighters and police officers without reasonable suspicion of drug use complied

### b. Count II

Count II alleges that the Local Rules—in particular, the rule imposing a 20 percent "cap" and the rule authorizing a "summary suspension"—constitute a violation of Plaintiffs' due process rights under the Fourteenth Amendment.[8] Though Plaintiffs do not mention the Pretrial Release

_____

with Fourth Amendment); *Knox Cnty. Educ. Ass'n v. Knox Cnty. Bd. of Educ.*, 158 F.3d 361, 384 (6th Cir. 1998) (finding suspicionless drug testing of school employees reasonable because the employees' privacy interests are "significantly diminished by the level of regulation of their jobs and by the nature of the work itself" and because there is a strong public interest that these employees "perform their jobs unimpaired"); *Transp. Workers' Union of Philadelphia, Loc. 234 v. Se. Pennsylvania Transp. Auth.*, 884 F.2d 709 (3d Cir. 1989) (upholding constitutionality of random drug testing program of employees in "safety-sensitive positions" by transportation authority despite lack of individualized suspicion); *Aubrey v. Sch. Bd. of Lafayette Par.*, 148 F.3d 559 (5th Cir. 1998) (upholding school board's policy of conducting suspicionless drug testing of elementary school employees for student safety); *Dimeo v. Griffin*, 943 F.2d 679 (7th Cir. 1991) (random drug testing of jockeys and horse race participants pursuant to rule promulgated by the Illinois Racing Board to address public safety interests did not violate Fourth Amendment).

[8] In the last paragraph of Count II, Plaintiffs state, "The Plaintiffs are seeking a declaratory judgment that the Defendants' enforcement of the Local Rules has violated the equal protection rights of the equal protection rights [sic] guaranteed to the Plaintiffs and their agents under the Fourteenth Amendment of the Constitution of the United States." (Doc. No. 30 at 13). But Plaintiffs do not actually state an Equal Protection claim; instead, they simply request a declaratory judgment pursuant to the Equal Protection clause. The Complaint does not discuss elsewhere any alleged violation of equal protection. As the County Defendants put it, "the Amended Complaint does not contain sufficient factual allegations—in fact, no factual allegations whatsoever—to even understand the basis for the Equal Protection claim." (Doc. No. 45 at 32).

In response to the Motions to Dismiss, Plaintiffs state, "Plaintiffs have been deprived of the equal protection of a property interest enjoyed by professional bondsmen under the laws of the State of Tennessee. In particular, they have been denied the ability to write lawful bonds up to the full value of their available capacity." (Doc. No. 58 at 6). It is clear that a plaintiff cannot supplement a complaint via arguments made in response to a defendant's dispositive motion. *See Campbell v. Univ. of Louisville*, 862 F. Supp. 2d 578, 583 (W.D. Ky. 2012) ("'A plaintiff may not amend his complaint through arguments in his brief in opposition to a mot ion for summary judgment.'" (quoting *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). So the Court keeps in mind that it cannot accept as true, or as part of the Complaint, any (alleged) facts implied in Plaintiffs' Response but not actually in the Complaint; Plaintiff's Response arguably implies (alleged) facts not in the Complaint, but the Court would have to disregard any that were thus implied.

It appears to the Court that in the Response, Plaintiffs are simply conflating their due process claims with a vague "equal protection" claim that was not actually alleged in the

Program under Count II, construing the Complaint in the light most favorable to Plaintiffs, the Court finds that the Complaint also alleges a due process violation related to the Pretrial Release Program.[9]

Via Count II, Plaintiffs seek "a declaratory judgment that the Defendants' summary suspension policy violates the due process rights guaranteed to the Plaintiffs and their agents under the Fourteenth Amendment." Count II does not include a request for damages; however, Plaintiffs include a separate "damages" section in the Complaint, wherein Plaintiffs allege that they "have been harmed in real and substantive ways by the Defendants' policies and should be compensated accordingly"; the alleged harm includes a loss of business revenue, a loss of "business good will by the Plaintiffs," and a "loss of public confidence in the private bail system." (Doc. No. 30 at 14–15). Thus, construing the Complaint in the light most favorable to Plaintiffs, the Court will proceed as if Count II does seek damages in addition to declaratory relief.

For the following reasons, with respect to each Due Process claim under Count II, Plaintiffs have failed to allege facts sufficient to satisfy the Article III standing requirements.

---

Complaint. And in response to Defendants' argument that Plaintiffs failed to identify any entity "similarly situated" to them that was treated differently, Plaintiffs state, "This is simply not true. While there are other examples, the one issue that is glaring in its injustice is that Local Rule 2(d) provides that new agents can only be added in January and July of each year." (Doc. No. 58 at 10). But while Plaintiffs recite Rule 2(d) in the Complaint, they do not discuss any equal protection implications of this rule, and they do not mention Rule 2(d) when requesting declaratory relief related to equal protection. Nor can the Court piece together from these nebulous arguments any actual equal protection claim.

The Court thus does not construe the Complaint as attempting to state a claim based on an alleged violation of the Equal Protection Clause of the Fourteenth Amendment and will not address whether Plaintiffs would have standing to bring such a claim.

[9] Earlier in the Complaint, Plaintiffs state, "This pretrial release program . . . serves to unconstitutionally deprive the Plaintiffs of due process and property interests protected under the Fourteenth Amendment . . . by releasing defendants who had a secured bond set by the magistrate without obtaining that security and depriving the Plaintiffs of their livelihood." (Doc. No. 30 at 9). Additionally, the parties discuss a due process claim based on the Pretrial Release Program in the Motions to Dismiss and Plaintiffs' Response.

*i. Summary suspension policy*

Plaintiffs allege under Count II that via the Local Rules, Defendants have implemented "a procedure which summarily punishes the Plaintiffs by suspending or terminating their right to write bonds without a contemporaneous hearing," and that this procedure "impermissibly shifted the burden of proof away from the State to show why the Plaintiffs should be suspended to the Plaintiffs to show why they should be reinstated." (Doc. No. 30 at 12–13). Plaintiffs do not specify under Count II which particular provision of the Local Rules related to the suspension of bail bonding companies supposedly violates their due process rights. The Complaint recounts multiple provisions of the Local Rules that call for suspension of a bail bonding agent or company under certain circumstances:

- Local Rule 6(6) allows for the immediate suspension of any agent who tests positive for an illegal substance pursuant to the Local Rules' drug-testing policy, pending a show cause hearing before the Administrative Judge. (Doc. No. 30 at 4).

- Local Rules 4(1) and 4(2) state that a bonding company that has exceeded its forfeiture limit (i.e., an outstanding forfeiture of more than 50 percent of the amount of collateral posted with the Clerk) at the time of the Clerk's monthly report will "be automatically suspended by the Clerk, be removed by the Clerk from the approved list, and the Clerk will immediately notify the Court, the Sheriff, and the District Attorney" with bail bond writing privileges only to be reinstated when "the forfeitures are again within the company's allowable limits and upon Order from the Court." (Doc. No. 30 at 5).

- Local Rule 4(6) states that a bail bonding company that refuses or neglects to pay any forfeitures within ten days of the forfeiture becoming "final" will be "immediately suspended and barred from making further bonds." (Doc. No. 30 at 6).

- Local Rule 6(5) calls for "a suspension for not less than ninety (90) days" for any agents or employees of a bonding company failing to "conduct themselves in accordance with all the rules and orders of the Sheriff and Circuit Courts of the 16th Judicial District while performing required duties within such buildings," with additional suspensions for a second violations. (Doc. No. 30 at 6). "After any suspension, the bonding company must petition the Court for reinstatement of the bonding company and/or agent. The penalty for a third or subsequent violation of this provision is termination of the privilege to write bonds in the 16th Judicial District." (*Id*.).

- Local Rules 7(5) through 7(7) call for "the immediate suspension of the bonding company and agent from writing bonds for a period of not less than three (3) months for a first offense" and "not less than six (6) months" for a second offense where the bonding company makes or initiates credit bonds on cases where the total bonds for any defendant exceeds $20,000. (Doc. No. 30 at 6). This rule allows the bonding company to "petition the Court for a hearing to reconsider the suspension." (*Id*.).

<u>Injury-in-fact</u>

The Complaint includes no allegations that any Plaintiff has been suspended pursuant to any of these provisions of the Local Rules since the time of their enactment in 2015. Nor do Plaintiffs allege that any such suspension is "imminent" or that a significant possibility exists that they will be suspended pursuant to one of these provisions of the Local Rules in the future. The Court therefore finds that Plaintiffs have failed to allege an injury-in-fact related to the "summary suspension" policies contained in the Local Rules such that Plaintiffs would have Article III standing to bring this claim. *Lyons*, 461 U.S. at 101–102. *See also Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 388 (6th Cir. 2020) ("speculative allegations of past and future harm

are certainly insufficient" to establish standing, particularly when considering that in *Lyons*, plaintiff's actual evidence of previously being subject to police chokehold allegedly authorized by city policy was not even enough for the Supreme Court to find Article III standing to enjoin city from employing police chokehold policy).

### ii. 20 percent "cap"

Plaintiffs allege under Count II that the Local Rule 3(5) sets forth "a complicated procedure that limits the authority of authorized and solvent professional bondsmen to write bail by imposing . . . a 'cap' on any single bond of 20% of available capacity" and that this rule has infringed on Plaintiffs' ability "to make otherwise authorized and lawful bonds, resulting in a loss of revenue and significant hardship." (Doc. No. 30 at 12). Plaintiffs contend that this rule constitutes an "unlawful and unconstitutional restriction[] on Plaintiffs' business activities" that deprives them of their due process rights under the Fourteenth Amendment. (*Id*. at 12–13).

In its entirety, Local Rule 3(5) states:

> Any bonding company approved by the Court after the effective date of these rules, may write total bonds in an amount equal to eight (8) times the amount of cash security posted with the Clerk, any bonding company approved prior to the effective date of these rules, may write ten (10) times the amount of cash security posted with the Clerk. No bonding company shall be allowed to write any one single or blanket bond for an individual defendant in excess of twenty (20) percent of its available bonding capacity as determined by the clerk on a monthly basis.

(Doc. No. 30 at 5).

Injury-in-fact

Plaintiffs state generally that this rule has "result[ed] in a loss of revenue and significant hardship" for Plaintiffs, but Plaintiffs do not set forth facts establishing any concrete injury. Though the Court must draw reasonable inferences in Plaintiffs' favor, the Court cannot reasonably infer from the facts alleged that Plaintiffs have in fact, as is conclusorily alleged, lost

business or revenue because of this rule imposing a "cap" of 20 percent of available capacity for a single bond. For example, Plaintiffs do not allege that there has been any instance where a particular Plaintiff endeavored to do business with a criminal defendant, but was prevented from doing so by Local Rule 3(5). Further, Plaintiffs do not articulate what they mean by—let alone allege factual matter indicating—the "significant hardship" that has allegedly resulted from Local Rule 3(5). Given the dearth of alleged factual matter to support them, these claimed harms are nebulous, speculative, and lacking the "concrete and particularized" nature required to establish an injury for purposes of Article III standing.

### iii.   *Pretrial Release Program*[10]

---

[10] Though the current discussion involves standing—a prerequisite to any analysis by the Court of the substance of Plaintiffs' claims—the Court finds it necessary to mention (without discussing in a comprehensive manner unnecessary at present) a glaring issue underlying the Complaint as well as Plaintiffs' and Defendants' briefing on the Motions to Dismiss. The distinction between substantive due process claims and procedural due process claims is, to put it mildly, analytically important. To provide just one example, albeit not necessarily one ultimately implicated in the present case, "[m]ost, if not all, state-created contract rights, while assuredly protected by procedural due process, are not protected by substantive due process." *Charles v. Baesler,* 910 F.2d at 1349, 1353 (6th Cir. 1990).

In the Complaint Plaintiffs assert due process claims without explicitly labeling such claims as sounding in either procedural due process or substantive due process. Throughout the Motions to Dismiss and accompanying briefing in relation to the Pretrial Release Program, the parties fail to recognize the distinction or to opine on how these claims are properly characterized. For whatever reason, they cite almost exclusively to procedural due process cases (such as *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) and *Town of Castle Rock, Colo. V. Gonzalez*, 545 U.S. 748 (2005)). But the Court is inclined to mention that while Plaintiffs' due process claim relating to the "summary suspension" provision of the Local Rules (i.e., the suspension of a bail bondsman's ability to write bonds without a contemporaneous hearing) is properly characterized as a procedural due process claim, the Court views Plaintiffs' claims related to the Pretrial Release Program and the 20 percent "cap" provision to both sound in substantive due process.

Injury-in-fact

In the Motions and accompanying memoranda, Defendants devote the majority of their standing arguments to a discussion of Plaintiffs' lack of Article III standing related to the Pretrial Release Program. In particular, Defendants argue that because (according to Defendants) Plaintiffs lack a "legally cognizable" liberty or property interest under the Due Process Clause,[11] Plaintiffs cannot establish an "injury-in-fact" for Article III purposes. (Doc. No. 45 at 18; Doc. No. 48 at 5). But this interpretation misstates what must be pled for a plaintiff to establish standing under Article III. Under Defendants' view of Article III standing, a plaintiff must plausibly allege the deprivation of an interest actually protected by the Due Process Clause (*i.e.*, something cognizable as a liberty interest or property interest for purposes of the Due Process Clause)[12] in order to sufficiently allege

---

[11] The Due Process Clause of the Fourteenth Amendment prescribes a prohibition against "any State depriv[ing] any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. 14, sec. 1. So generally, absent the deprivation of something legally cognizable as "life, liberty, or property," a plaintiff cannot establish a violation of the Due Process Clause; the existence of such a deprivation (without whatever it is that constitutes "due process") is required for a due process claim. *See Siefert v. Hamilton Cnty.*, 951 F.3d 753, 762 (6th Cir.), *cert. denied sub nom. Hamilton Cnty. Job & Fam. Servs. v. Siefert*, 141 S. Ct. 896 (2020) ("States cannot 'deprive any person of life, liberty, or property, without due process of law.' To sue under this clause, the [plaintiffs must have a liberty or property interest that triggers the process requirement, and then they must show they received insufficient process." (quoting U.S. Const. amend. XIV)); *Guertin v. State*, 912 F.3d 907, 922 (6th Cir. 2019) (noting that a plaintiff asserting a substantive due process claim must (i) demonstrate "'a deprivation of a constitutionally protected liberty or property interest'" and (ii) "show how the government's discretionary conduct that deprived that interest was constitutionally repugnant." (quoting *Am. Exp. Travel Related Servs. Co. v. Ky.,* 641 F.3d 685,688 (6th Cir. 2011)). True, the Sixth Circuit has recognized an exception to this requirement when a state statute is being challenged. *See, e.g., Am. Express Travel Related Servs. Co.*, 641 F.3d at 688–89 (noting that although "plaintiff[s] must demonstrate a deprivation of a constitutionally protected liberty or property interest in order to establish a due process violation based on discretionary conduct of government officials, such a showing is not necessary to establish that a state law is unconstitutional." (citation omitted)). But that exception is not implicated here.

[12] In some cases, ones typically involving death sentences given to convicted murderers, the right to "life" may alternatively or additionally be implicated, but otherwise it is liberty and property interests that are implicated in cases raising due process challenges, and for this reason many

that it has suffered an "injury-in-fact" as required for standing under Article III. Nothing in Article III itself so suggests, nor do Defendants cite any authority for this view. And were this to be the case, a district court would have to undergo an analysis of the merits of a due process claim as a part of the standing analysis—which runs counterintuitive to the very idea that standing is a jurisdictional question that must be addressed before reaching the merits of a party's claim. Moreover, the second element of standing—that the plaintiff's injury is fairly traceable to the challenged action of the defendant—suggests that the standing analysis is performed without delving into the merits of the challenge to the defendant's action; in evaluating standing, the Court looks at the link between the injury and the challenged action, not whether the challenge to the defendant's action is substantively meritorious. So the Court does not see why a plaintiff cannot be credited with adequately alleging the requisite injury-in-fact from an action of an (official) defendant challenged on due process grounds, irrespective of whether the due process challenge lacks merit because no relevant cognizable liberty or property interest has been alleged.[13]

Thus, the Court will instead rely on cases that discuss "injury-in-fact" as set forth in Article III jurisprudence, rather than undertaking an analysis of whether Plaintiffs allege deprivation of a cognizable liberty or property right as required for a due process claim to be substantively viable.

In the Complaint, Plaintiffs allege that the Pretrial Release Program "depriv[es] the Plaintiffs of their livelihood" by "releasing defendants who had a secured bond set by the magistrate without obtaining that security" and that this constitutes an injury under Article III.

judicial opinions discussing the requirements of the Due process Clause omit any substantive reference to an interest in "life."

[13] The Court notes that some of what Defendants raise here regarding the substantive merits of Plaintiffs' claimed liberty and/or property interests under the Due Process Clause *do* factor in to the prudential standing discussion the Court raises below (i.e., whether Plaintiffs fall within the constitutionally-protected zone of interests).

(Doc. No. 30 at 9). As an initial matter, the Court is not convinced that this constitutes an allegation of a cognizable *injury* (as opposed to a claimed deprivation of a liberty interest (in practicing their profession) or property interest (in the fruits of the potential sales of bonds that allegedly were lost)). Instead, the only possible cognizable injury the Court can construe the Complaint to allege is Plaintiffs' claimed loss of business. As stated by the Fourth Circuit,

> "'[F]inancial harm is a classic and paradigmatic form of injury in fact.'" *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (2018) (*quoting Cottrell v. Alcon Labs.*, 874 F.3d 154, 163 (3d Cir. 2017)). And, as the Supreme Court has made clear, lost business opportunities satisfy this requirement. *See, e.g., Craig v. Boren*, 429 U.S. 190, 194, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

*Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210–11 (4th Cir. 2020). But lost business may not be merely speculated; a loss of business that is "only conjecture" is not enough to confer Article III standing. *Rancho Viejo Waste Mgmt., LLC v. City of Laredo*, 364 F. Supp. 3d 698, 704 (S.D. Tex. 2019).

The only factual matter supporting Plaintiffs' claimed lost business is a set of allegations regarding alleged "agreements" between unidentified "criminal defendants" and "Plaintiffs." Plaintiffs state that "Rutherford County's pretrial program has released 219 criminal defendants without proper judicial authority or adequate security" and that "[a] large portion of those 219 criminal defendants either intended to or would have secured release through the use of the Plaintiffs' services." (Doc. No. 30 at 8). Plaintiffs state that they "were asked by the criminal defendant, or by someone on behalf of the criminal defendant, to secure the release of the criminal defendant" and that "Plaintiffs and the criminal defendant, or someone on behalf of the criminal defendant, reached an agreement," but when Plaintiffs went to the jail to engage in a transaction with the defendant, "the Plaintiffs were told that the services of the Plaintiff were no longer necessary." (*Id.*). ——This conclusory set of assertions, containing vague references to "the

Plaintiffs" (plural), "the Plaintiff" (singular), and "the criminal defendant," is not enough to allege standing because it is not "concrete" or "particularized." In *Spokeo, Inc. v. Robins*, the Supreme Court defined the particularization and concreteness requirements of Article III standing:

> For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Ibid.*, n. 1; see also, *e.g., Cuno, supra,* at 342, 126 S. Ct. 1854 ("'plaintiff must allege personal injury'"); *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L.Ed.2d 135 (1990) ("'distinct'"); *Allen v. Wright,* 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L.Ed.2d 556 (1984) ("personal"); *Valley Forge, supra,* at 472, 102 S. Ct. 752 (standing requires that the plaintiff "'personally has suffered some actual or threatened injury'"); *United States v. Richardson,* 418 U.S. 166, 177, 94 S. Ct. 2940, 41 L.Ed.2d 678 (1974) (not "undifferentiated"); *Public Citizen, Inc. v. National Hwy. Traffic Safety Admin.,* 489 F.3d 1279, 1292–1293 (C.A.D.C.2007) (collecting cases).
>
> [. . .]
>
> A "concrete" injury must be "de facto"; that is, it must actually exist. See Black's Law Dictionary 479 (9th ed. 2009). When we have used the adjective "concrete," we have meant to convey the usual meaning of the term—"real," and not "abstract." Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967). Concreteness, therefore, is quite different from particularization.

578 U.S. 330, 339–40 (2016). The Court cannot construe the allegations in the Complaint to affect any particular Plaintiff in a personal and individual way because Plaintiffs do not allege any particular Plaintiff to which this scenario (of a defendant entering an "agreement" to secure the release of a defendant and then later being told that the security was no longer required) in fact applied. Instead, Plaintiffs argue in the abstract that the Pretrial Release Program deprived all of them of doing business with hypothetical criminal defendants whom Plaintiffs anticipated would have done business with them were they not released subject to the Pretrial Release Program. The Court finds it quite implausible that multiple Plaintiffs (or, perhaps all Plaintiffs[14]) had made such

---

[14] The Complaint does not clearly allege whether such agreements were made between each criminal defendant and all Plaintiffs *collectively*, or between each criminal defendant and a single Plaintiff. This distinction is not insignificant for purposes of the standing analysis. If (as the Court

"agreements" with even some of these 219 criminal defendants. Nor do Plaintiffs plausibly allege, with factual matter as required, that these criminal defendants would have needed a bond were it not for the Pretrial Release Program. And even if they did, Plaintiffs also fail to explain the nature of the "agreements" they refer to in the Complaint, leaving the Court with a lack of understanding as to how Plaintiffs were injured on account of such agreements. Plaintiffs have thus failed to meet their burden of alleging facts that meet the concreteness and particularization requirements for an injury-in-fact necessary for Article III standing.

Even if the Court were to find Plaintiffs stated a cognizable injury in the form of lost business, Plaintiffs still must allege that such injury is "fairly traceable" to the challenged action. *Doe*, 2020 WL 1285428, at \*2. As the undersigned has previously explained,

> The requirement that an injury be "fairly traceable" to a defendant's conduct does not mean that the plaintiffs must prove to an absolute certainty that the defendant's actions caused or are likely to cause the injury; rather, the plaintiffs need only show that there is a substantial likelihood that the defendant's conduct caused (or will cause) the plaintiffs' harm. *NC RSOL v. Boone*, 402 F. Supp. 3d 240, 250 (M.D.N.C. 2019); *New York v. Scalia*, 464 F. Supp. 3d 528, 540–42 (S.D.N.Y. 2020) (noting that the "fairly traceable" standard is lower than that of proximate cause); *Isabel v. Reagan*, 394 F. Supp. 3d 966, 973 (D. Ariz. 2019) (same).

*Memphis A. Phillip Randolph Inst. v. Hargett*, 485 F. Supp. 3d 959, 979 n.13 (M.D. Tenn. 2020), *vacated and remanded sub nom. Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548 (6th Cir. 2021). Plaintiffs have failed to allege facts sufficient to meet even this "lower" standard. Plaintiffs allege no facts that plausibly suggest that any time a prospective customer ended up deciding not to use a certain Plaintiff's services, the decision was the result of the prospective

---

finds to be the more plausible scenario) an agreement existed between a single Plaintiff and a particular criminal defendant, and that criminal defendant broke off that agreement, it could very well be because that defendant decided to engage the services of a different bail bonding company (a different Plaintiff, perhaps) and *not* because that defendant no longer needed to post bail due to the Pretrial Release Program. This distinction has particular import when considering the "fairly traceable" prong of the standing analysis, discussed below.

customer being released pursuant to the Pretrial Release Program. But at least in some jurisdictions, a percentage of criminal defendants are routinely released on their own recognizance without any requirement that they post a monetary bail.[15] And even if Plaintiffs' allegations could be construed to adequately allege that each of these 219 defendants had been ordered to post bail, there is no factual matter to suggest that just because "the criminal defendant" "told" Plaintiffs "that the services of the Plaintiff were no longer necessary," (which of course can be a line someone gives a vendor when the services are necessary but the customer chose a different vendor), this means that the Plaintiff's services *actually* became unnecessary. Still less does it show that if the services indeed did become unnecessary, that outcome was the result of the Pretrial Release Program.

In summary, due to a failure both to plausibly allege an injury-in-fact and to plausibly allege that any injury was "fairly traceable" to the Pretrial Release Program, Plaintiffs fail to plead factual allegations sufficient to establish Article III standing,

Prudential standing

Alternatively, though the Court need not and does not discuss herein the cognizability of the claimed liberty and/or property interests in assessing Article III standing, the Court finds it appropriate to decline to exercise jurisdiction over this claim for lack of prudential standing.[16] *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100 (1979) ("[A] plaintiff may still

---

[15] True, that may not have been the case, prior to the implementation of the Pretrial Release Program, in the particular jurisdiction here at issue. But that's just the point: if it is not true in this particular judicial district, Plaintiff would have been well served to allege that in the Amended Complaint to bolster its allegation that the lack of a cash bond (potentially to be provided by one of the Plaintiffs) was the result of the Pretrial Release Program.

[16] To be clear, having found that Plaintiffs lack Article III standing to bring any of the claims asserted in the Complaint, the Court does not need to address prudential standing at all. But the Court does so to demonstrated the existence of an alternative basis for the Court's determination that Plaintiffs lack standing.

lack standing under the prudential principles by which the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim."). Unlike constitutional standing, prudential standing is a judicially-created doctrine used for "judicial self-governance." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Some applications of the doctrine of prudential standing are irrelevant here, such as where the asserted harm is a "generalized grievance" shared by a large class of citizens. *Id*. at 499. But the Sixth Circuit has explained another facet of prudential standing that the Court views to be highly relevant to the instant action:

> Additionally, prudential standing includes a requirement that "the plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Valley Forge Christian Coll.*, 454 U.S. at 475, 102 S. Ct. 752. Although these three prudential requirements have a "close relationship to the policies reflected in the Art[icle] III requirement of actual or threatened injury amenable to judicial remedy," the theoretical underpinnings of the two are rather distinct. *Id*. Unlike the doctrine of prudential standing, the constitutional standing requirement of a "distinct and palpable injury that is likely to be redressed if the requested relief is granted ... states a limitation on judicial power, not merely a factor to be balanced in the weighing of so-called 'prudential' considerations." *Id*.

*Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir. 2007). Therefore, "[u]nder the prudential limitations on standing, however, even when litigants have established a substantial injury from a government action, they 'cannot challenge its constitutionality unless [they] can show that [they are] within the class whose constitutional rights are allegedly infringed.'" *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 207 (6th Cir. 2011) (quoting *Barrows v. Jackson*, 346 U.S. 249, 256 (1953)).

The State Defendants cite two cases when arguing that Plaintiffs are not within the zone of interest protected by the constitutional provisions they claim were violated[17]. (Doc. No. 48 at 11–12). Neither case is binding authority, and neither expressly references the doctrine of *prudential* standing.

The first of these cases nevertheless provides illustrative guidance for the Court for considering the prudential aspects of standing at issue here. In *Smith v. City of Hammond, Indiana*, a bail bondsman brought a Sec. 1983 action against the city and various city officials alleging that the city's refusal to accept a surety bond issued by the bondsman deprived him of his property interest in his bondsman license in violation of the Due Process Clause. The Seventh Circuit held that the bail bondsman not only failed to state a claim to relief[18], but also lacked (what this Court views to be *prudential*) standing[19] for the following reason:

---

[17] Although not using the term "prudential standing" when making this argument, the State Defendants do appear to (appropriately) acknowledge that the "zone-of-interests" inquiry is one that is made separately from the Article III inquiry. (Doc. No. 48 at 11 ("Moreover, even assuming Plaintiffs have standing and allege a sufficiently concrete and particularized injury, such an injury would fall well outside of the zone of legal interests protected by the Fourth and Fourteenth Amendments.")). The State Defendants also cite *Smith v. Jefferson County Bd. of School Com'rs*, 641 F.3d 197 (6th Cir. 2011), in this section of their brief—a case dealing squarely with the topic of prudential standing. *See id.* at 206 (describing one of the "prudential requirements for standing" to be that "the complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (internal quotation marks omitted)).

[18] "As if this weren't enough to demonstrate the frivolous nature of this suit, [the bail bondsman] is claiming a violation of the Fourteenth Amendment, which requires that he show an entitlement that can be characterized as property or liberty to issue surety bonds, and we saw earlier that he cannot show that." *Id*. at 308. The Seventh Circuit went on to reiterate that setting of bail "is a judgment for the judge to make—not the bondsman by suing the judge. It is, moreover, a discretionary judgment, as we noted earlier." *Id*. The Court then suggested that the district court dismiss the "plainly meritless" action "without further ado" and cautioned the plaintiff that if he "persists in this hopeless litigation, he—and his lawyer—are courting sanctions." *Id*.

[19] The Seventh Circuit did not explicitly frame this discussion in terms of *prudential* standing. But the Court reads this opinion to apply to the prudential-standing analysis because the reasoning

A provider of services to a court has no standing to challenge judicial rulings that reduce the demand for his services and hence his income. He is injured but he is not within the protected class. If a judge who is "soft" on crime releases arrested persons on their own recognizance, a bail bondsman cannot challenge the judge's ruling on the ground that it will reduce the bondsman's business. Manufacturers of shackles cannot sue when a judge decides that criminal defendants shall not be shackled in his courtroom. Smith could not sue the prosecutor for not bringing enough charges for violent crime (the sort that lead to surety bonds), or for charging too many poor defendants on the theory that the public fisc does not pay as handsomely as solvent defendants do. When the Federal Reserve juices up the economy, pawnbrokers cannot head to court to stop the undermining of their livelihoods.

388 F.3d 304 at 307–308 (7th Cir. 2004).[20] The Seventh Circuit's language has particular relevance here, where (as alleged by Plaintiffs) the magistrate holds discretion when making bail determinations[21]. Like the bondsman in *Smith*, Plaintiffs cannot claim prudential standing to sue for their loss of business based on a determination that particular defendants are well-suited for the Pretrial Release Program even if such determination leads to a loss of business for Plaintiffs.

---

focuses on whether the injured party is "within the protected class" of the law being challenged and does not frame its discussion in terms of the requirements of Article III.

[20] Unlike the Seventh Circuit in *Smith*, the Court will not reach the issue of judicial immunity herein. The law strikes the undersigned as unclear as to whether judicial immunity is (a) treated as divesting the court of subject-matter jurisdiction; or (b) is treated as a merits-based defense. Because the Court finds a lack of subject-matter jurisdiction here based on the doctrine of standing, it should not venture into an analysis of judicial immunity if in fact it is a merits-based issue (*i.e.*, defense). *See, e.g.*, *Serna v. Cooksey*, No. 1:20-CV-689 JB/KRS, 2022 WL 525930, at *5 (D.N.M. Feb. 22, 2022) ("The Court does not reach the issue of collateral estoppel because it lacks [subject-matter] jurisdiction to hear arguments on the merits.") *report and recommendation adopted*, No. CIV 20-0689 JB/KRS, 2022 WL 1284529 (D.N.M. Apr. 29, 2022). But even if judicial immunity is treated as a defense sounding in the lack of subject-matter jurisdiction, it would be appropriate for the court to decline to address it, inasmuch as the court has found a lack of subject-matter jurisdiction for some other reason (lack of standing). *See Terry v. First Merit Nat'l Bank*, 75 F. Supp. 3d 499, 512 (D.D.C. 2014) ("Because the Court concludes that all claims against Defendant must be dismissed because of the absence of subject matter jurisdiction pursuant to the *Rooker–Feldman* doctrine . . . , the Court does not reach other merits-based arguments or jurisdictional bases for dismissing the claims against Defendant, including the argument that there is neither diversity nor federal question jurisdiction over this action.").

[21] Defendants summarize the Tennessee statutes giving magistrates such discretion when making bail determinations. (Doc. No. 45 at 21; Doc. No. 48 at 6–7).

Though Plaintiffs, unlike the plaintiff in *Smith,* here are not *directly* challenging a particular judicial ruling or bond determination, by challenging the Pretrial Release Program, Plaintiffs are in essence questioning the judiciary's determination of whether to release a criminal defendant without requiring secured bail. Thus the distinction between the claims asserted in *Smith* and the claims asserted here are immaterial. Plaintiffs claim that the Pretrial Release Program "releases criminal defendants without proper judicial oversight and in contravention of the laws of the State of Tennessee"—but Plaintiffs, bail bonding companies, lack (prudential) standing both to challenge determinations of which criminal defendants should or should not be released without bail and to assert that the Pretrial Release Program results in an improper exercise of judicial oversight over criminal defendants.

The second case cited by the State Defendants, *Holland v. Rosen*, 277 F. Supp. 3d 707 (D.N.J. 2017), *aff'd*, 895 F.3d 272 (3d Cir. 2018), frames the holding cited by the State Defendants as related not to prudential standing, but rather an issue crucial to Article III standing—whether a plaintiff has shown an injury-in-fact to his "legally protected interest" *White v. United States*, 601 F.3d 545, 555 (6th Cir. 2010) (defining "injury-in-fact" as "an invasion of a legally protected interest"). This case thus provides little support for Defendants' position regarding their "zone of interest" argument (which is not an Article III concept but instead a consideration for purposes of prudential standing). But the Court need not rely on this particular case to reach the conclusion that it does, because for the aforementioned reasons, Plaintiffs lack prudential standing to assert a violation of the Due Process Clause related to the Pretrial Release Program.[22]

---

[22] If anything, *Holland* would only undermine Defendants' position (one that is adopted by the Court above) that Plaintiffs do not allege a cognizable injury-in-fact. In *Holland*, the plaintiffs were (i) a bail bonding company who alleged a loss of business resulting from the enactment of New Jersey's Criminal Justice Reform Act ("CJRA"); and (ii) a criminal defendant who, pursuant

<u>Conclusion</u>

In sum, Plaintiffs failed to allege factual matter sufficient to show both prudential standing and an "injury-in-fact" under Article III. Accordingly, the motions to dismiss Count II will be granted for lack of standing.

### c. Count III

Via Count III, Plaintiffs "seek[] a preliminary injunction against the enforcement of the local rules and the modification of those rules pending a resolution of this case." (Doc. No. 30 at 14). In Count III, though asking the Court to award a preliminary injunction, Plaintiffs completely fail to identify any cause of action—or any alleged constitutional violations or other misconduct that allegedly would support a preliminary injunction.[23] There is nothing wrong with a complaint

---

to the CJRA, was not afforded the right to have monetary bail considered as a condition of his pre-trial release. *Id.* at 727. The district court held that the bail bonding company adequately alleged a concrete and particularized injury sufficient for the Article III injury-in-fact requirement by alleging that "[t]he . . .CJRA [ ] has severely harmed [the plaintiff's] business by dramatically reducing the number of defendants given the option of monetary bail and thus dramatically reducing [the plaintiff's] opportunity to act as surety on bail bonds."[22] *Id.* at 728.

The Court notes that it appears not to see eye-to-eye with the court in *Holland* on this issue. But this apparent divergence of opinion may result largely from the different factual contexts in which this case and *Holland* were decided. Plaintiffs here (purportedly) support their claim of lost business with a set of unclear, implausible, and conclusory contentions that the Court could not even afford the assumption of truth. By contrast, the bail-bonding company in *Holland* supported its allegation of an Article III injury with data regarding the impact of the CJRA on its business. *Holland*, 277 F. Supp. 3d at 723 ("According to [the plaintiff], the CJRA 'dramatically reduc[ed] the number of defendants given monetary bail and thus dramatically reduc[ed] [Lexington's] opportunity to act as surety on bail bonds.' (*Id.*) That the CJRA has all but eliminated the use of money bail and bail bonds to secure pretrial release *is indeed demonstrated by the data*[.]") (emphasis added).

[23] Quite conceivably, Plaintiffs had it in their mind that Count III's request for a preliminary injunction was based on one or more of the constitutional violations alleged earlier in the Complaint. But if Plaintiffs sought, pursuant to Count III, a preliminary injunction based on the Fourth Amendment or Fourteenth Amendment claims set forth in Counts I and II, Plaintiffs were not clear in doing so (and in any event, would lack standing to seek any relief on those claims, for

mentioning in some manner or other that the plaintiff is (or will be) requesting a preliminary injunction, though the plaintiff should realize that such a request is not legally operative and that instead a separate motion must be filed to seek such relief. But the fact remains that such a request by itself neither constitutes, nor reflects, a cause of action that exists as a separate claim. As Count III constitutes nothing but a bald request for a preliminary injunction, it would be subject to dismissal for failure to state a claim, inasmuch it does not even attempt, or even purport to attempt, to state a claim.

But as noted above, the Court should not make this sort of merits-based, 12(b)(6) determination if it lacks subject-matter jurisdiction. And here it does, due to Plaintiffs' lack of standing. Not surprisingly, given that Count III serves only to ask for a particular kind of relief, it fails to allege a cognizable injury-in-fact, let alone one traceable to Defendants' alleged wrongful conduct (of which, with respect to Count III, none exists). Thus, Count III will be dismissed for lack of Article III standing.

## CONCLUSION

For the reasons discussed herein, the Court will grant the Motions to Dismiss (Doc. Nos. 44 and 47), and this case will be dismissed without prejudice.[24]

---

the reasons discussed above). Furthermore, if Plaintiffs wish to seek a preliminary injunction, they would need to do so via a proper motion.

[24] "Although federal courts are inclined to grant leave to amend following a dismissal order, there are circumstances where amendment will not be allowed." *Sinay v. Lamson & Sessions Co*., 948 F.2d 1037, 1041 (6th Cir. 1991). Plaintiffs did not request leave to amend in the event the Court were to grant the Motions, and "a district court does not abuse its discretion in failing to grant a party leave to amend where such leave is not sought." *Id.* at 1042 (citing *Carl Sandburg Village Condominium Ass'n v. First Condominium Dev. Co.*, 758 F.2d 203, 206, n. 1 (7th Cir. 1985)). The Court exercises its discretion to dismiss without granting leave to amend, but notes that the effect of this decision may be limited because the dismissal is necessarily without prejudice, as the Court must dismiss *without prejudice* any case in which the plaintiff fails to establish subject-

An appropriate order will be entered.

Eli Richardson

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

matter jurisdiction. *Kokkonen v. Guardian Life Ins. Co*, 511 U.S. 375, 377 (1994); *Ernst v. Rising*, 427 F.3d 351, 366 (6th Cir. 2005).